1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   HERMAN JOHNSON,

11              Petitioner,                    No. CIV S-08-2995 GEB CHS

12        vs.

13   MICHAEL KNOWLES,

14              Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16                        I.  INTRODUCTION

17              Petitioner Herman Johnson is a state prisoner proceeding pro se with a petition for

18   writ of habeas corpus brought pursuant to 28 U.S.C. §2254.  The pending petition challenges the

19   constitutionality of petitioner's conviction entered in Sacramento County, case 04F05543, for

20   robbery with use of a firearm.

21                II.  FACTUAL AND PROCEDURAL BACKGROUND

22              The facts of petitioner's offense were set forth in the unpublished opinion of the

23   California Court of Appeal, Third District, case C050093:

24              On June 21, 2004, at the Madison Inn, a "party" motel, several
                Russian immigrants were drinking. When they went outside three
25              Black men approached; when one man nodded, another pulled a
                gun and robbed the immigrants; the third Black man did nothing.
26              David Johnson and Mitchell Green were arrested within the hour;

1

1  David Johnson was wearing one victim's watch and another
   victim's wallet was in the vehicle. Herman Johnson was found
2  hiding days later.

3  Mitchell Green was discharged at the preliminary hearing, due to
   insufficient evidence that he aided the other defendants in the
4  robbery, although he was present.

5  At trial David Johnson argued that the victims were so intoxicated
   that they lacked the ability to perceive and recollect what actually
6  happened that night; he also argued no gun was involved. Herman
   Johnson argued that the witnesses misidentified him in one of two
7  ways: Either the partiers saw him at the hotel and mistook him for
   a robbery participant, or they mistook him for the robber who
8  signaled the gunman, but instead he was the passive bystander with
   the robbers, not one of the two robbers- in other words, the victims
9  confused him for Mitchell Green.

10  (C050093 opinion at 1-2.)

11        A jury found petitioner guilty of two counts of second degree robbery while a

12  principal was armed.  It was also found that petitioner had incurred a prior robbery conviction.

13  He was sentenced to a determinate term of fourteen years and four months in state prison.  The

14  California Court of Appeal, Third Appellate District, affirmed the convictions on direct appeal

15  and the California Supreme Court denied review.  A petition for review to the California

16  Supreme Court was likewise denied.

17        Petitioner and David Johnson's state appeals were heard at the same time and

18  under the same case numbers.  David Johnson is not a party to this proceeding.

19        III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

20        An application for writ of habeas corpus by a person in custody under judgment of

21  a state court can be granted only for violations of the Constitution or laws of the United States.

22  28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

23  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

24  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

25  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

26  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

1   AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state

2   court proceedings unless the state court's adjudication of the claim:

3       (1) resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established Federal law, as
4       determined by the Supreme Court of the United States; or

5       (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
6       State court proceeding.

7   28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

8   *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

9   A reviewing court such as this one looks to the last reasoned state court decision in order to make

10   this determination. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S.

11   919 (2003).

12         Under the "contrary to" clause of §2254(d)(1), a federal habeas court may grant

13   the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme

14   Court on a question of law or if the state court decides the case differently than the Supreme

15   Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405.  The state

16   court is not required to cite the specific controlling test or Supreme Court authority, so long as

17   neither the reasoning nor the result of the state court decision contradict same. *Early v. Packer*,

18   537 U.S. 3, 8-9 (2002).

19         The court may grant relief under the "unreasonable application" clause if the state

20   court correctly identifies the governing legal principle but unreasonably applies it to the facts of

21   the particular case. *Williams*, 529 U.S. at 410.  The focus of this inquiry is whether the state

22   court's application of clearly established federal law is objectively unreasonable. *Id*.  "[A]

23   federal habeas court may not issue the writ simply because that court concludes in its

24   independent judgment that the relevant state-court decision applied clearly established federal

25   law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id*.

26   /////

IV.  ISSUES PRESENTED

Petitioner claims that his constitutional rights were violated when (A) the trial court improperly denied his request for a continuance; (B) his challenge to the prosecutor's use of peremptory challenges was overruled; and (C) the prosecutor committed misconduct during presentation of evidence and closing argument.

V.  DISCUSSION

A.      Denial of Request for Continuance

First, petitioner claims that the trial court deprived him of his due process right to a fair trial and his right to present a defense when it denied his attorney's motion for a continuance.

1.      Background

Jury selection for petitioner's trial commenced on April 21, 2004, and petitioner's attorney moved for a continuance two days prior, on April 19, 2004.  (Reporter's Transcript ("RT") at 55-56.)  The prosecutor objected to the requested continuance.

Petitioner's attorney sought the continuance because he had just learned that the identification expert he had planned to call was not available until after May 4, 2004.  Counsel explained that he did not have the witness under subpoena because the witness was available and had agreed to appear in mid March when it was originally anticipated that trial would commence, however, the trial had been continued.  Counsel went on vacation, first sending a letter to the witness asking if he was available by April 14, 2004.  When counsel returned from vacation on April 14, 2004, he learned that the expert would not be available to testify until after May 4, 2004.

Counsel argued that the expert was essential to petitioner's case because there were discrepancies in the identification of the active members of the robbery, and he anticipated the expert would testify "that Caucasions do have trouble identifying people of other races."  (RT at 56-57.)  He also informed the court that he had met with his client on April 17, 2004 to explain

4

1   that a continuance would be needed so the expert could testify; petitioner had indicated that he

2   was not willing to "waive time" and wished to proceed without the expert's testimony.  Although

3   it appears that the issue of petitioner's competency was not previously raised, counsel indicated

4   to the court his doubts about whether petitioner fully understood the need for the expert.  (RT at

5   58-59.)

6   　　　　　　The trial court indicated that it did not agree with the notion that an eyewitness

7   expert was essential to petitioner's case, observing:

8   　　　　　　THE COURT: I think we would all agree that there are-- every
   　　　　　　case is different.  And there are all different kinds of experts.  And
9   　　　　　　depending on the facts of the case, some experts are absolutely
   　　　　　　essential.  It's the whole case.  It might be a DNA issue.  ID
10  　　　　　　experts, although they can in some circumstances be important,
   　　　　　　this case does not strike me that he's basically essential to your
11  　　　　　　case.  I disagree with you on that.

12  　　　　　　This is a situation where, as I understand it from our conversations,
   　　　　　　and some of the remarks that you've made here today, your
13  　　　　　　argument's going to be, yes my client's there, but he's the guy
   　　　　　　that's standing around doing nothing.
14
   　　　　　　So these people that identify him as being there, the argument is
15  　　　　　　not that they have misidentified him as being there, but they are
   　　　　　　getting people mixed up as to who's doing what.
16
   　　　　　　[PETITIONER'S COUNSEL]: Which is crucial, Judge.
17
   　　　　　　THE COURT: I know, but that happens to everybody.  But that's a
18  　　　　　　matter for cross-examination.  You don't need cross-racial or
   　　　　　　anything else.  People are running around.  You have four victims
19  　　　　　　and three defendants, and there's a lot of people to keep track of.
   　　　　　　So I just don't think it's a question of ID.  I mean, they show him a
20  　　　　　　photo ID, do they not?  And they are able to pick him out.  As I
   　　　　　　understand it, also he gives a statement to the police admitting he
21  　　　　　　was there ... [¶] The idea is not that, you know, "I'm not even
   　　　　　　there, I've got an alibi, I'm somewhere else."
22
   　　　　　　[PETITIONER'S COUNSEL]: Judge, he admitted being at the
23  　　　　　　hotel, not necessarily at the scene of the robbery.

24  　　　　　　THE COURT: All right.  But nonetheless, just based on our
   　　　　　　discussion, I did not get the impression that the ID is that crucial in
25  　　　　　　this case.

26  　　　　　　The other thing is that -- well, it seems to me that there are various

5

1   ID experts around besides the one that you've got.  Have you tried
    other people?

2

3   [PETITIONER'S COUNSEL]: No, Judge, because I had already --
    the panel had approved this individual, and we had an
    understanding with him.

4

5   THE COURT: I know.  But you learned on the 14th.  Couldn't you
    find out what other experts are available?

6   [PETITIONER'S COUNSEL]: The 14th was Thursday.

7   THE COURT: I don't want to denigrate them or anything, but they
    are not allowed to come in and testify as to their opinion about

8   what happened in this case.  They basically have this same thing to
    say, which was okay'd by the Supreme Court in McDonald as to

9   the problems with eyewitness identification.  You don't need any
    certain expert for that.  You don't need the doctor who examined

10  your client.  Anybody could come in.  Any expert could come in.
    Doesn't have to be that person.

11

12  (RT at 60-61.)

13         After further discussion, the court issued its ruling:

14  I am trying to weigh the prejudice that's involved here.  If you
    conclude that you can't get another eyewitness expert, I just don't

15  feel that, based on what I know about this case, that it's all that
    crucial.

16

17  Having said that, I would hope that you'd continue your efforts.  I
    mean, the ICDP has already approved the money, so the money has
    been allocated.  Doesn't seem to me that they would care whether

18  you want to say, "Instead of Mr. Smith, I want to use Jones."  I'd
    contact them and get your investigator on it, find out who else --

19  who the other eyewitness experts are.  Get a copy of the reports, if
    you can get them back -- what's the doctor's name?

20

21  [PETITIONER'S COUNSEL]: Blender.

22  THE COURT: If you can get the reports back from his office, get
    them for the new guy.  You've got to try.

23  You're shaking your head.   You don't think it can be done?

24  [PETITIONER'S COUNSEL]: I think it can be done.  But again,
    it's based on the relationship, as I indicated, that I had already

25  established, and it is based on the fact that it was a surprise to me
    when I got back, you know, from my vacation.

26

1      THE COURT: Right.  And I'm not saying that every case is just --
       you don't even need to talk to your expert, because one case is like
2      every other case.  No.  I think you need to sit down with this expert
       and talk to him and say, "Here's what the issues are, here's why
3      I'm calling you," just as you would any witness.

4      [PETITIONER'S COUNSEL]: I just want the record to be clear
       that I think that this part of the matter is crucial, and that based on
5      that, I'm making that request.

6      THE COURT: All right.

7      [PETITIONER'S COUNSEL]: I don't want the record to indicate
       in the future that I have not tried, and that as a consequence I'm --
8      you know, ineffective assistance of counsel has been rendered in
       this case.
9
       THE COURT: All right.  I have heard and considered the
10     arguments by [petitioner's counsel] with respect to the motion to
       continue on behalf of his client, Herman Johnson, and that motion
11     is denied.

12   (RT at 65-67.)

13          On direct appeal, the California Court of Appeal, Third District, held that the trial

14   court had not abused its discretion in denying the motion for a continuance or the subsequent

15   new trial motion as to this issue.  The state appellate court reasoned:

16     Before jury selection, Herman Johnson moved for a continuance to
       obtain an expert on cross-racial identification. The motion was
17     denied. He renewed the matter in a motion for a new trial, which
       was also denied.
18
       Whether to grant a continuance rests within the broad discretion of
19     the trial judge and defendants, as the appellants, bear the burden to
       demonstrate the trial court abused his discretion. (See *People v.*
20     *Panah* (2005) 35 Cal.4th 395, 423.)

21     "When a continuance is sought to secure the attendance of a
       witness, the defendant must establish 'he had exercised due
22     diligence to secure the witness's attendance, that the witness's
       expected testimony was material and not cumulative, that the
23     testimony could be obtained within a reasonable time, and that the
       facts to which the witness would testify could not otherwise be
24     proven.' [Citation.] The court considers ' "not only the benefit
       which the moving party anticipates but also the likelihood that such
25     benefit will result, the burden on other witnesses, jurors and the
       court and, above all, whether substantial justice will be
26     accomplished or defeated by a granting of the motion." ' " (*People*

                                        7

*v. Jensen* (2000) 22 Cal.4th 900, 1037.)

On Tuesday, April 19, 2005, Herman Johnson's counsel moved for a continuance, stating as follows: He had an understanding with Dr. Blender, an identification expert, that he would be available for the trial, which had been scheduled to begin in mid-March, 2005. Counsel had not subpoenaed Dr. Blender, but had written him a letter asking if he would be available by mid-April; counsel then went on vacation. When counsel returned from vacation on Thursday, April 14, 2005, he found a message from Dr. Blender, stating he would not be available until after May 4, 2005. Counsel asserted that issues about cross-racial identification were significant in this case because the victims were Russian Caucasians and the defendants were Black: In particular, one defense would be that the victims mistook Herman Johnson for Mitchell Green, who had been identified as an active participant in the robbery before trial but exonerated when a victim identified Herman Johnson at the preliminary hearing instead of Green as a participant.

However, Herman Johnson *refused to waive time to accommodate counsel's motion.*

The court clarified that the defense would be that Herman Johnson was present but the victims were confused about who did what. The court found the defense could find a new expert on the subject and-based on an offer of proof-found the identification was corroborated. The court encouraged counsel to try to find another expert and denied the motion.

When the trial court suggested counsel try to find another expert counsel conceded, "I think it can be done," but explained that he already had a relationship with Dr. Blender. The court stated that an expert would not be allowed to testify as to identifications *in this case* but only about cross-racial identifications in general (see *People v. McDonald* (1984) 37 Cal.3d 351, 366-369, overruled on other grounds by *People v. Mendoza* (2000) 23 Cal.4th 896, 914), therefore there was no reason why another expert would not do.

On appeal counsel states, "It was not for appellant (who has, in any event, a history of mental illness) ... to make the tactical decision about whether to call an expert and the importance of having an expert testify." The passing claim of mental illness is unsupported and although the decision to call an expert may have been counsel's, the decision to waive time is not ordinarily counsel's. (See 5 Witkin & Epstein, Cal.Crim. Law (3d ed. 2000) Crim. Trial, §§ 317-323 [counsel cannot waive *constitutional* speedy trial rights, only *statutory* speedy trial rights, and even that ability is limited].)

/////

The record indicates trial counsel conceded he could have obtained another expert, although that was not his preference, and it might involve some administrative difficulty. At no time later in the trial did counsel report back on his efforts to obtain another expert, therefore it appears he made none. Instead, counsel emphasized the problems with the identifications through cross-examination and argument. (See *People v. Sanders* (1995) 11 Cal.4th 475, 510 [no prejudice in excluding expert testimony on identifications where "counsel extensively cross-examined eyewitnesses concerning the accuracy and reliability of their testimony," instructions pointed out factors to consider in evaluating eyewitness testimony, and counsel argued the matter to the jury].)

Thus, counsel did not establish that the continuance was *necessary,* his client refused to waive time for trial, and counsel had not subpoenaed Dr. Blender or otherwise ensured his availability for trial. In these circumstances we cannot say the trial court abused its discretion in denying the motion for a continuance or the subsequent new trial motion on this point.

(C050093 opinion at 3-6.)

2.     Discussion

The matter of whether to grant a trial continuance is traditionally within the discretion of the trial judge. *Avery v. Alabama*, 308 U.S. 444, 446 (1940). There are no specific tests for deciding when a denial of a continuance is so arbitrary as to violate due process. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589. Depending on the circumstances, a denial of a request for more time may not violate due process "even if the party fails to offer evidence or is compelled to defend without counsel." *Id*.

On direct appeal from a federal criminal conviction, the Ninth Circuit Court of Appeals balances four factors in determining whether a trial court unreasonably denied a criminal defendant's motion to continue: (1) the appellant's diligence in preparing his case; (2) the likelihood that the continuance would serve a useful purpose; (3) whether the continuance would inconvenience the parties, the court, or other witnesses; and (4) whether the appellant was prejudiced by the district court's refusal to grant the request for a continuance. *United States v.*

*Rivera-Guerrero*, 426 F.3d 1130, 1138-39 (9th Cir. 2005); *see also United States v. Flynt*, 756 F.2d 1352, 1359 (9th Cir. 1985).  In the context of a collateral challenge to a state court conviction, this court is not required to apply the same test; nonetheless, the criteria applied by the Ninth Circuit in reviewing federal convictions on appeal is useful in analyzing the constitutional claim posed here.

It does not appear that the trial court unreasonably denied petitioner's counsel's request for a continuance.  First, diligence in securing the witness' testimony was not shown.  The witness was not under subpoena, and at the time the continuance was requested, petitioner refused to waive time and wished to proceed without the expert testimony.  The record is unclear whether the defense attempted to contact another expert.

In order for habeas relief to be warranted a petitioner must show actual prejudice to his defense resulting from the trial court's improper refusal to grant a continuance.  *Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 2299 (1998).  Here, the trial court observed that the desired witness would not have been permitted to offer an opinion as to what happened in this particular case.  The trial court also indicated it's belief that such expert testimony was not essential to petitioner's defense, and that the issue of witness identification was, rather, a matter for cross-examination.  Petitioner makes no argument to the contrary here.  Other than the simple fact that witnesses often have trouble identifying people of other races, it is not apparent what beneficial testimony, if any, this or another eyewitness identification expert would have offered had the continuance been granted.

Petitioner has not shown actual prejudice to his defense resulting from the lack of expert testimony at trial.  Although there was no expert testimony about cross-racial witness identification, petitioner's counsel effectively attacked the witnesses' version of events on cross-examination.  (RT 362-99, 419-22, 521-46, 582-86.)  The jury was  instructed that the "cross-racial or ethnic nature of [an] identification" is one factor to be considered in determining the weight to be given to eyewitness identification testimony.  (RT at 1018.)  Counsel also

1 highlighted in closing argument the fact that the eyewitness identification in this case was cross-

2 racial in nature. (RT at 978-79).

3        Here, the trial court's ruling did not preclude petitioner's attorney from preparing

4 or presenting an adequate defense. Under these circumstances, the California Court of Appeal's

5 decision that the trial court properly denied the motion for continuance is not contrary to, or an

6 unreasonable application of clearly established federal law. *See Gallego*, 124 F.3d at 1072-73.

7 Petitioner's claim regarding the trial court's denial of a continuance before trial should be denied.

8         B.      Prosecutors' Use of Peremptory Challenges

9        For his next claim, petitioner contends that the trial court improperly denied his

10 motion for a mistrial based on the prosecutor's misuse of peremptory challenges to excuse a

11 prospective African-American juror in violation of his rights under the Sixth and Fourteenth

12 Amendments of the United States Constitution.

13         1.      Background

14        During voir dire, the prosecutor asked prospective Juror J. about his educational

15 background. (Augmented RT at 230.) Mr. J indicated that he had attended some college and that

16 his particular field of study was psychology. Mr. J indicated that he was still interested in

17 psychology. When asked whether he did anything to pursue the area of psychology in his own

18 time or in the community, he responded:

19            [MR. J]: What I more or less do, after going through the school and
           the college, is really helping people, and more or less like the
20            homeless and young kids in my area and on my block.

21            [PROSECUTOR]: Okay.

22            [MR. J.]: The kids.

23            [PROSECUTOR]: So are you trying to learn more about human
           psychology to assist --
24

25            [MR. J.]: Not trying to learn, more just trying to help more.

26            [PROSECUTOR]: Okay.

1

2

> [MR. J.]: Because I know the situations that they're in and stuff
> like that.  And yeah, just to help.

3   (Augmented RT at 230-31.)  Mr. J. clarified that he was referring to homeless people both in

4   Sacramento and in Indiana, where he is apparently from, and stated that he also takes care of his

5   family.  Mr. J. affirmed that pursuing or studying the field of psychology helps him in these

6   endeavors.  When asked if he volunteered in any programs to help homeless people, Mr. J.

7   responded:

8

9

> [MR. J.]: No.  What I do is not volunteer - yes, I more or less
> volunteer to help.  It's a few companies that I help out.

10

> [PROSECUTOR]: That you help out?

11

> [MR. J.]: Yes.

12

> [PROSECUTOR]: That in turn help out the homeless?

13

> [MR. J.]: Uh-huh.  Young kids and families and stuff like that.

14

> [PROSECUTOR]: And how do you assist them?

15

> [MR. J.]: Like over the weekends, when I'm off of work, or when I
> take my vacation, just go to those situations.

16

17

> [PROSECUTOR]: And you're helping people in the community
> that are homeless?

18

> [MR. J.]: Uh-huh.

19   (Augmented RT at 231-32.)  Mr. J. agreed that some of the homeless people he helped suffered

20   from mental illness or had contact with the criminal justice system.  Mr. J. said that he did not

21   obtain a degree in psychology; he was drafted into the military.  (Augmented RT at 233-34.)

22   While in the military Mr. J. participated in two court-martial proceedings.  Mr. J was questioned

23   and responded as follows regarding his experiences:

24

> [PROSECUTOR]: ...And you indicated that you did serve on at
> least two court-martials while in the Air Force.

25

26

> [MR. J.]: (Nods head.)

1    [PROSECUTOR]: Yeah?

2    [MR. J.]: Yeah.

3    [PROSECUTOR]: And that, from my limited understanding of it,
     it is a lot smaller of jurisdictional venue or jury than in this case?
4
5    [MR. J.]: Oh, yes.

     [PROSECUTOR]: Than in our country or even in state law?
6
     [MR. J.]: Uh-huh.
7
     [PROSCUTOR]: Sometimes you people who are under a court-
8    martial can be judged by a group of people in the military as small
     as four?
9
     [MR. J.]: Right.
10
     [PROSECUTOR]: Like four or six people are judging the facts.
11   Right?

12   [MR. J.]: Yes.

13   [PROSECUTOR]: Nothing like the twelve that we talk about here?

14   [MR. J.]: Uh-huh.  That's right.  Really don't have no one.  More
     or less told to -- just standing there, working there.  And the whole
15   situation came out.  What had happened, I can't talk about.

16   But in those situations, you have to more or less go back to, you
     know -- before it goes bad, you know.  You don't have -- it's
17   something that, you know, someone else is doing.  Not help them,
     it can hurt them.  And he was doing something wrong, the person
18   was, so -- but the reason why that happened, he was drinking that
     night, and so that's what -- pretty much what happened.
19
     [PROSECUTOR]: So when you think about the court-martial
20   process, were you being asked to listen to the facts of another
     soldier or officer --
21
     [MR. J.]: Uh-huh.
22
     [PROSECUTOR]: -- who was being court-martialed?
23
     [MR. J.]: Yes.
24
     [PROSECUTOR]: Had you ever been on the other side of that, like
25   where you were the one sort of on trial?

26   [MR. J.]: No.

                              13

[PROSECUTOR]: Okay, so you've always been sort of a fact finder?

[MR. J.]: Yes.

[PROSECUTOR]: And how did you feel about that process?

[MR. J.]: Like you says, one that I had to be at.  But you know, I had to be there.

[PROSECUTOR]: Okay.  And is there any feelings that linger from those experiences?  We're talking a little while ago.  Right?

[MR. J.]: Uh-huh.

[PROSECUTOR]: That make you hesitant to sort of join a larger group along the same lines and listen to the facts in this case?

[MR. J.]: No.  Not any more.  No.  Just maintain my business, and that's it in the service.

[PROSECUTOR]: And in court-martials, is it a situation where you knew the person being court-martialed?

[MR. J.]: Uh-huh.

[PROSECUTOR]: Okay.  And is that -- does that -- did that make it worse or better as far as your ability to sit in judgment?

[MR. J.]: More or less like you was saying, and like they was indicating, everybody knew each other.  So it wasn't that you didn't know what was going on in situations like that.  Just more or less, honestly, tell the truth.  Didn't have no choice.  It wasn't make up a situation.  The military doesn't work like that, because there's only so many people there.  You can't be saying situations -- stuff like you can hear out of the services.  You just don't go for that, because it doesn't exist, and you can't say it does.

[PROSECUTOR]: Okay.  Are you talking like excuses?

[MR. J.]: Yeah.  Exactly.

[PROSECUTOR]: Okay.  Things that may happen or excuse conduct outside of military court [don't] seem to apply?

[MR. J.]: Yes.

[PROSECUTOR]: Is what you're saying?

[MR. J.]: Yes.

1    [PROSECUTOR]: And how do you have -- how do you feel about
2    that, given this scenario?

3    [MR. J.]: This is much better.  The situations is you have more
     freedom, because like I was indicating there, there you're there.
4    Get locked up, you're locked up.  And that's a lock up you don't
     want, put in that situation.

5    [PROSECUTOR]: Very good.  Thank you.

6    (Augmented RT at 233-36.)  After further questioning of all the prospective jurors, all attorneys

7    passed for cause.  (Augmented RT at 256.)

8          During peremptory challenges, the prosecutor excused Mr. J.  (Augmented RT at

9    258.)  Co-defendant D. Johnson's attorney asked to approach.  After the jury was excused, co-

10   defendant D. Johnson's attorney stated she was making a "*Batson/Wheeler*" challenge, and was

11   also challenging the jury pool as a whole for  lack of diversity.  Co-defendant D. Johnson's

12   attorney argued that Mr. J. was present throughout selection process and appeared to be

13   interested in what was going on, and was responsive to questions.  She argued that there was

14   "nothing exciting" about Mr. J.'s questionnaire in that he had no contact with law enforcement,

15   no victimization history, no arrest history, and was a member of the military.  (Augmented RT at

16   260.)  She also stated that the prosecutor spent the majority of her individual questioning

17   focusing on Mr. J.  Petitioner's attorney noted that Mr. J. Was the only African-American left in

18   the panel at the time of challenge and joined in the motion.  (Augmented RT at 262.)

19         The court made several observations, including that the questioning of Mr. J. was

20   not desultory when compared to questioning of the other members of the panel, that the

21   defendants are of the same racial group as the challenged jurors, and that the victims are of a

22   different racial group.  (Augmented RT at 268-69.)  The court further observed:

23   THE COURT: We just lost a female Asian juror, Ms. K., because
     of her medical problems.  And I think [co-defendant D. Johnson's
24   counsel] is correct, and I don't - that we have lost several minority
     jurors.  And I don't think she's - and she hasn't contended that
25   there was anything improper or unreasonable about the excuses in
     those cases, although I think that she had some concerns about -
26   which one was it?

15

1

[PROSECUTOR]: Mr. S.

2

THE COURT: Mr. S.   It may have been Mr. S. That she voiced an
objection to, and he was African American.

3

4

[CO-DEFENDANT JOHNSON'S COUNSEL]: From memory,
there were - I believe there were four African American jurors
who, besides Mr. S., through no fault of anyone's, had legal
excuses to leave this jury panel.

5

6

7   (Augmented RT at 269-70.)

8          The court noted that besides Mr. J., there were other minority jurors remaining,

9   and that no pattern of challenges existed against a particular cognizable group.  (Augmented RT

10   at 270-71.)  The court asked the prosecutor to explain her reasons for excusing Mr. J.:

11

[PROSECUTOR]: Certainly.  On Mr. [J.'s] questionnaire, there are
at least four misspelled words, one of which is the word that
inquires whether or not he has earned any degrees.  And you'll
recall that I asked Mr. J. whether he had a degree -- or what area
did he study, because I cannot tell from the way it's misspelled
whether its psychology or physics or something.

12

13

14

He ended up saying that the field of study was psychology.  The
way he's written it on his juror questionnaire is P-S-H-Y-I-C.

15

16

It is my intention in this case, given the potential for an
identification expert to testify in this case, to stay away from any
juror from a background in psychology.  That was one of the areas
I was going to voir dire about, and the Court told me that I was not
going to be allowed to get into that.  So I left it at an inquiry of
people with backgrounds in psychology or those who are trained in
psychology or have an over-familiarity with the topic, which Mr. J.
seemed to have.

17

18

19

20

In addition, I'm generally always interested in people who have
been in the military.  However, I got more confused after I inquired
of Mr. J. About his experience with the court-martials.  He
indicated that he was always on the side of the fact finder and
never court-martialed himself.  He spoke of those people being
court-martialed as being limited by virtue of the military justice
system in the excuses that they could use.  In other words, the
excuses that work in the outside world don't work in the military
world.

21

22

23

24

25

That concerned me for this case, because he seemed- and then
getting into the work that he said he did with-

26

16

THE COURT: You're saying that -- I, quite frankly, I must confess, had some trouble understanding him when he was speaking.  Did anybody else have that situation? [Co-defendant D. Johnson's counsel], did you understand everything he was saying?  And I don't mean in a grammatical structure sense, I just mean -

[PROSECUTOR]: His train of thought.

THE COURT: Pardon me?

[PROSECUTOR]: His train of thought.

THE COURT: I'm talking to [co-defendant D. Johnson's counsel].

[CO-DEFENDANT JOHNSON'S COUNSEL]: His dialect?

THE COURT: No, his mumbling, his not speaking distinctly.  Did you have any trouble understanding him?

[CO-DEFENDANT D. JOHNSON'S COUNSEL]: At times I did.

THE COURT: How about you, [PETITIONER'S COUNSEL]?

[PETITIONER'S COUNSEL]: Not -- I understood most of the things he said.

THE COURT: What I'm thinking about doing is having his -- the dialogue between he and [the prosecutor] read back to us all.

[PROSECUTOR]: I don't know if it was a function of his dialect or a function of me not hearing what he was saying, but at times I had difficulty, but I understood overall what he was saying.  A lot of jurors have spoken -- or one juror in particular, memorable juror, you had to tell to speak up.

THE COURT: All right.  So [prosecutor], are you saying when you were talking to him about the court-martial, he -- his statement was that, in effect, that he was concerned about the fairness, although he didn't say it in that many words, of a military court-martial, in that excuses that might have worked on the outside didn't work in the military?  Is that what he said?

[PROSECUTOR]: That's what I gathered, yes.  And his statements that it was like a horrible place to be, you wouldn't want to be in that place, i.e., the person being court-martialed, I got the sense that he felt sorry for them.

And I had a concern that perhaps then, and now in this case, he may base a decision in this case on emotion.  And I had to lean forward quite a bit to listen to him.  And I was understanding less

17

1        and less, and so I just kind of stopped asking him questions.

2        But I believe my conversation with him ended on how he was
         helping the homeless and mentally ill, and what he did on his
3        weekends, and how he helped them.  And again, he seemed liberal-
         minded in the sense that he would base a decision on emotion
4        because he felt sorry for the people.

5  (Augmented RT at 275-76.)  The trial court inquired whether the prosecutor had any other

6  reasons.  She responded:

7        [PROSECUTOR]: Those are mainly my reasons.  I'm looking for -
         I mean, the spelling errors concern me.  That's about it.
8
         THE COURT: Now, the spelling error, I see where under degrees
9        he misspelled, what, physics?

10       [PROSECUTOR]: I think that's supposed to be psychology, an
         abbreviation for psychology.
11
         THE COURT: All right.  So that's misspelled.  What other
12       misspellings?

13       [PROSECUTOR]: Under previous employer on the right side of
         the form, I believe it's supposed to say Unisource Company.
14
         Under question number four regarding information regarding
15       information regarding spouse or other adults with whom you
         reside, the occupation is listed as wild, and then it's animal spelled
16       A-N-A-I-M-A-L.

17       And then the employer listed right under that under question four is
         federal.  I guess that's spelled correctly.
18

19  (Augmented RT at 275-76.)

20       The court asked the prosecutor about the connection between people with a

21  background in psychology and whether or not the defense called an expert witness; she

22  responded:

23       [PROSECUTOR]: Yes It had been my intent to voir dire on and try
         and seek out people who may give undue weight to an
24       identification expert, given that they have studied or have trained
         in the area of psychology or have an over-familiarity with a topic.
25
         Also seek out and ferret out those jurors -- potential jurors who
26       may be vulnerable to or be likely to be unduly influenced by the

                                          18

1    testimony of a forensic psychologist.

2         THE COURT: A forensic psychologist?

3         [PROSECUTOR]: I don't even have the CV of the potential ID
     expert in this case.  I have a CV from 1999.  I think he's a medical
4    doctor, but I'm not sure.  This is a general outline of an area of
     inquiry that I use in cases with identification experts.  It's typed
5    out.  I've used it in other cases.  It's an area that I explore in voir
     dire.

6
          THE COURT: So I understand you correctly, your concern is that
7    if [petitioner's counsel] does manage to locate and have testify an
     eyewitness expert, that to a large extent those persons have some
8    background in psychology.  Is that what you are saying?

9         [PROSECUTOR]: Yes.

10        THE COURT: And you feel that people that have a background in
     psychology themselves, as potential jurors, might tend to be more
11   empathetic toward such an expert?

12        [PROSECUTOR]: Not necessarily sympathetic, but just I don't
     want any juror knowing any more than any other juror by virtue of
13   their background.  In other words, have some outside knowledge
     that they would tap into, because a lot of what psychology is, is
14   studies.  And that's what a lot of times these identification experts
     testify about, is statistical studies.

15

16   (Augmented RT at 276-77.)

17        Petitioner's attorney and co-defendant D. Johnson's attorney were heard on the

18   issue, and argued against the prosecutor's proffered reasons.  Among other things, defense

19   counsel noted that the prosecutor spent more time questioning Mr. J. compared to other jurors

20   and argued that her reasoning was contradictory in that she implied that he was both too educated

21   because of his psychology background and not educated enough because of the spelling errors.

22   (Augmented RT at 277-80.)

23        The court recessed and indicated its desire to review Mr. J's entire statement due

24   to the difficulty understanding his responses.  (Augmented RT at 280-81.)  The following day the

25   court noted that it had received and reviewed the transcript and that copies had been provided to

26   the parties.  The court then made the following statement:

THE COURT: Okay.  Just while this one situation is in my mind, I know the law says that you're not supposed to think of excuses for the prosecutor, but back on this issue of trying to understand what Mr. J. Was saying, when I looked at that transcript, it wasn't so much that I couldn't hear what his words were - and the word I was looking for was syntax.  When you read the transcript, it's hard to understand what he was saying.

But that's just about it as far as explanation as to some of the things.  Like when [the prosecutor] was making her arguments yesterday, I suspected that she was right, but I couldn't really recall what was said, and that's why I had the transcript typed up.

So you can say, "Well, Judge, you should have stopped him and told him to speak up."  But that wasn't the point that he wasn't speaking up.  I just had trouble understanding him.

(Augmented RT at 284.)

The trial court summarized the law in the area and then made the following findings:

Number one, [the prosecutor] was concerned about three misspellings on his questionnaire.  This is the type of thing that does not go unnoticed by the attorneys on either side of the counsel table, and generally is looked upon as a negative factor in the equation.  Whether or not this shortcoming can be characterized as relatively minor, there can be no doubt it is a legitimate concern.

This court is not required then to perform a comparative analysis of the other jurors' questionnaires to determine how many of them have misspellings and whether the jurors that she excuses have or have not misspellings in their questionnaires.  This does not note as a comparative analysis.  In that regard it's not required.  This does not mean that the defense is precluded from making relevant arguments in that regard.

The prosecutor has stated that from her perspective, she has misgivings about Mr. J.'s background in psychology, because if the defense were to produce an expert in the area of eyewitness identification, that expert's background normally is based, to a large extent, upon psychology, which, in her opinion, then would appeal more to a person with a similar type background, such as Mr. J.

There's nothing inherently or patently disingenuous about her explanation in this regard.

[The prosecutor] mentions and is concerned that Mr. J. is very

20

interested and involved in helping the homeless and volunteers his time to help them.  Commendable as that is, this prosecutor's concerned this activity evinces a liberal mind-set, which, in her opinion, does not make a good juror for the prosecution.

Again, this court finds that this is a legitimate reason for the exercise of the challenge, and is not a sham or pretext to cover a desire to deprive the defendant of the equal protection of the law.

Regarding the juror's experience on two court-martials while in the military, the prosecutor felt that, even though he wasn't the one being prosecuted, that he had concerns about -- arguably about the fairness of the military court-martial process.

In this regard I did have the transcript prepared.  It's somewhat difficult to discern from the cold transcript what Mr. J.'s concerns were, but it seems like he was stating that, in effect, that the military situation is not -- seemed not as fair as what we have here. And again, from the prosecutor's perspective, she indicated that she's concerned that this is a juror who might be inclined to judge the evidence emotionally rather than objectively.

There's nothing inherently suspect about the prosecutor's reasoning.  Some might disagree with her conclusions, but the court finds they are genuine and not contrived.

Accordingly, the court finds that the defense has failed to establish or satisfy their burden of proof that the prosecutor impermissibly excused Mr. J. for reasons prohibited by the prescriptions of Wheeler/Batson and their progeny.  So the defense motion to dismiss the venire is denied.

(Augmented RT at 288-90.)

On direct appeal, the state appellate court found no error:

The trial court found defendants established a prima facie case of racial discrimination in the prosecutor's exercise of a peremptory challenge to juror J, a Black male who had served on two court-martial panels while in the Air Force. In response to the trial court's invitation, the prosecutor explained that J misspelled words on his questionnaire (including "pshyic" for "psychology"), had a psychology background, seemed "sorry" for people who had been court-martialed and, based on J's work with mentally ill and homeless people, "seemed liberal-minded in the sense that he would base a decision on emotion because he felt sorry for the people." In particular, since it was at that point not known whether or not Herman Johnson was going to have a psychologist testify as to the problems with cross-racial identification, the prosecutor was leery of having any jurors with psychology backgrounds serve in this case.

The trial court stated that J was hard to understand due to his mumbling, and the prosecutor at one point said, "I was understanding less and less, and so I just kind of stopped asking him questions." Because the trial court found J so hard to understand he wanted a readback or transcript of J's voir dire so the court could consider it before ruling on the defense motion.

The next morning the court had reviewed a transcript of J's voir dire and realized the problem was not so much J's mumbling but his syntax. We give an example. When the prosecutor asked J whether knowing the person being court-martialed had made serving on a court-martial "worse or better" he replied:

"More or less like you was saying, and like they was indicating, everybody knew each other. So it wasn't that you didn't know what was going on in situations like that. Just more or less, honestly, tell the truth. Didn't have no choice. It wasn't make up a situation. The military doesn't work like that, because there's only so many people there. You can't be saying situations-stuff like you can hear out of the service. You just don't go for that, because it doesn't exist, and you can't say it does."

When the prosecutor tried to clarify if J meant that more excuses worked outside of the military he seemed to agree and when she asked how he felt about that J said:

"This is much better. The situations is you have more freedom, because like I was indicating there, there you're there. Get locked up, you're locked up. And that's a lock up you don't want, put in that situation."

The trial court denied the motion, finding each of the prosecutor's stated reasons was legitimate and race-neutral; in particular the court mentioned J's comparisons of serving on court-martial juries with serving on this jury.

In upholding a challenge, a trial court need not *agree* with the reasons, but must find that they are genuine, specific and free of bias. They can be subjective or trivial, including body language, attitude, lack of attention and so forth. (*People v. Arias* (1996) 13 Cal.4th 92, 136; *Wheeler, supra,* 22 Cal.3d at p. 275; *People v. Allen* (2004) 115 Cal.App.4th 542, 547; *People v. Walker* (1998) 64 Cal.App.4th 1062, 1067.)

The ultimate issue is the persuasiveness of the reasons in light of the record, that is, whether the record supports the trial court's finding that the challenge was lawful. (See *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339 [154 L.Ed.2d 931, 951] ( *Miller-El I*); *People v. Reynoso* (2003) 31 Cal.4th 903, 907-908 (*Reynoso* ).) Formal findings are not needed:

"Where ... the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible [citation], and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (*Reynoso, supra,* 31 Cal.4th at p. 929.)

The *trial court* determines whether the stated reason is genuine and free from discriminatory intent, upon a reasoned evaluation of the prosecutor's explanation. (*People v. Hall* (1983) 35 Cal.3d 161, 167-168.) The appellate court gives great deference to the trial court's finding. (*People v. Ervin* (2000) 22 Cal.4th 48, 74-75; *Reynoso, supra,* 31 Cal.4th at pp. 918-919.) But deference is not abdication:

"When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

Defendants argue *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196] (*Miller-El II*) wrought fundamental changes in this area of law. We agree that *Miller-El II* is a significant case, but it did not change the *Batson* framework:

"The fundamental inquiry remains the same after [*Miller-El II*] as before: Is there substantial evidence to support the trial court's ruling that the prosecutor's reasons for excusing prospective jurors were based on proper grounds, and not because of the prospective jurors' membership in a protected group? If so, then defendant is not entitled to relief. In undertaking this inquiry, we note that the question is not whether we as a reviewing court find the challenged prospective jurors similarly situated, or not, to those who were accepted, but whether the record shows that the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects." (*People v. Huggins* (2006) 38 Cal.4th 175, 233.)

Contrary to the defense view, the trial court did not state that "any

23

trivial explanation" was enough; the trial court explicitly found that the explanations given were legitimate, that is, sincere and race-neutral. The record supports the prosecutor's concern that J viewed himself as a do-gooder who might take pity on a defendant for extra-legal reasons.

Further, although acknowledging at one point that the trial court should *not* "view[ ] each of the prosecutor's stated reasons in isolation[,]" defendants dissect each reason and advance alternative interpretations or inferences. For example, while poor spelling may be a trivial reason in many circumstances, here J misspelled "psychology," which was a subject he supposedly had studied. Further, J's study of psychology and his social work support the prosecutor's concern that he could have a "liberal" mindset, and a prosecutor may choose to strike "do-gooders" off of a jury without running afoul of the *Batson* rules. (See, e.g., *People v. Landry* (1996) 49 Cal.App.4th 785, 790-791; *People v. Perez* (1996) 48 Cal.App.4th 1310, 1315.)

Defendants separately claim the trial court erred by failing to engage in "comparative juror analysis." However, they failed to develop such an argument in the trial court and nothing in *Miller-El II, supra,* 545 U.S. 231 [162 L.Ed.2d 196] requires a trial court to perform such an analysis *on its own motion.* The trial court indicated the defense was free to make a comparative analysis. Further, defendants do not fairly develop their appellate claims by reference to truly comparable factors, no doubt because of the lack of a record to support valid comparisons. For example, appellate counsel states, "It is highly likely that other jurors made comparable spelling errors[,]" but because the issue was not explored in the trial court, there is no record to support such assertion.

Further, the Attorney General has illustrated other flaws in the comparative points proffered on appeal. The prosecutor struck the only other two jurors who indicated they had studied psychology. Whether other jurors who had college degrees or otherwise seemed educated might have taken some psychology courses is not revealed by the record, because trial counsel failed to make a comparative analysis in the trial court. Another juror who had served in the military had also served on two civilian juries, one civil and one criminal, and did not express unusual sentiments about that experience. Thus, his background was not comparable to J's in this regard.

The fact the prosecutor spent more time questioning J is explained by the confusion in J's answers, as the trial court impliedly found. Therefore, the record does not support the claim that the prosecutor improperly singled J out for disparate questioning. That the prosecutor did not question a juror who believed her son had been treated too harshly on drug charges, a juror whose sister was a

1  public defender, a juror who was a probation officer and a juror
2  who had a drunk-driving conviction does not reflect any nefarious
   purpose in her questioning of J nor in her decision to challenge J,
   despite counsel's assertion that these factors should have raised
3  "red flags" about those other jurors. Had a comparative analysis
   been made in the trial court, perhaps a record supporting the
4  assertion of disparate questioning could have been made, but on
   this record the claim is untenable.

5
   On this record we uphold the trial court's ruling.
6

7  (C050093 opinion at 6-11.)

8            2.      Discussion

9          As set forth by the California Court of Appeal, the Equal Protection Clause

10  prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the

11  basis of race. *Batson v. Kentucky*, 476 U.S. 79 (1986).  In order to prevail on a *Batson* claim, a

12  defendant must first establish a prima facie case of purposeful discrimination.  *Batson*, 476 U.S.

13  at 96-97; *Lewis v. Lewis*, 321 F.3d 824, 830 & n.18 (9th Cir. 2003); *United States v. DeGross*,

14  960 F.2d 1433, 1442 (9th Cir. 1992) (en banc).  Where, as in this case, the trial court finds a

15  prima facie case has been established, "the burden shifts to the State to come forward with a

16  neutral explanation for challenging" the juror in question.  *Batson*, 476 U.S. at 97.  *DeGross*, 960

17  F.2d at 1442; *Stubbs*, 189 F.3d at 1104.  The trial court must then decide whether the defendant

18  has carried his burden of proving purposeful discrimination.  *McClain v. Prunty*, 217 F.3d 1209,

19  1220 (9th Cir. 2000) (quoting *Hernandez*, 500 U.S. at 359); *see also Batson*, 476 U.S. at 98.  As

20  with any credibility determination, the court's own observations are of significant importance.

21  *Batson*, 476 U.S. at 98, n.21; *see also Lewis*, 321 F.3d at 830.

22          The issue at the final inquiry is the facial validity of the prosecutor's explanation.

23  *McClain*, 217 F.3d at 1220 (quoting *Hernandez*, 500 U.S. at 359); *see also Batson*, 476 U.S. at

24  98.  The prosecution's challenges need not rise to the level justifying use of a challenge for

25  cause.  *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (citing *Batson*, 476 U.S. at 97-

26  98).  Rather, a neutral explanation in this context means "an explanation based on something

1    other than the race of the juror." *McClain*, 217 F.3d at 1220 (quoting *Hernandez v. New York*,

2    500 U.S. 352, 360 (1991)).

3              If a review of the record undermines the prosecutor's stated reasons, or many of

4    the stated reasons, the explanation may be deemed a pretext.  *Id*.  On the other hand, "[e]vidence

5    in the record of objective reasons to strike a juror implies that racial bias did not motivate the

6    prosecutor."  *Boyd v. Newland*, 393 F.3d 1008, 1013 (9th Cir. 1987).  The fact that a prosecutor's

7    reasons may be "founded on nothing more than a trial lawyer's instincts about a prospective

8    juror" does not diminish the scope of acceptable invocation of peremptory challenges, so long as

9    they are the actual reasons for the prosecutor's actions."  *Power*, 881 F.2d at 740 (quoting *United*

10   *States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)).

11             In this case, the prosecutor articulated several reasons for excusing Mr. J.,

12   including that (1) he had misspelled and/or incorrectly abbreviated the field of study which he

13   reportedly pursued in college; (2) that field of study was psychology, which concerned the

14   prosecutor because of the potential for expert witness testimony from an identification expert; (3)

15   he had twice served as a fact finder in military court martial proceedings and gave vague and

16   confusing responses when asked about these experiences; and (4) he worked with and/or

17   volunteered time helping homeless and mentally ill individuals, and appeared to the prosecutor to

18   be a "liberal type" person who might base a decision on emotion.

19             The prosecutor's concern about petitioner's background in psychology and his

20   interest in helping the homeless and mentally ill falls within the well-settled rule that both

21   occupation and interest or experience in social service or similar fields are permissible, non-

22   discriminatory reasons for exercising peremptory challenges.  *See generally Hall v. Luebbers*,

23   341 F.3d 706, 713 (8th Cir. 2003) ("Occupation is a permissible reason to defend against a

24   *Batson* challenge, and being a social worker could be a legitimate basis to strike a prospective

25   juror."), *cert. denied,* 541 U.S. 996, 124 S.Ct. 2031, 158 L.Ed.2d 505 (2004); *United States v.*

26   *Smith,* 223 F.3d 554, 569 (7th Cir. 2000) (prosecutor's stated reason to strike a potential juror

1  because she was "a social worker type" who would be "too sympathetic towards the defendants"

2  was found non-racial); *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987)

3  ("Excluding jurors because of their profession, or because they acquitted in a prior case, or

4  because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's

5  prerogative.").

6         It is also well settled that a previous negative experience with law enforcement or

7  the judicial system constitutes an acceptable, race-neutral explanation for striking a potential

8  juror.  *See Mitleider v. Hall*, 391 F.3d 1039, 1048 (9th Cir. 2004).  The prosecutor's concern that

9  Mr. J. appeared to feel sorry for people involved in court martial proceedings is valid based on

10  this general rule.  *See Tolbert v. Gomez*, 190 F.3d 985, 989 (9th Cir. 1999) ("Challenging a

11  prospective juror on the basis of his expressed opinions about the judicial system does not violate

12  *Batson*.").

13         The reasons articulated by the prosecutor are facially valid.  Moreover, a review of

14  the record does not indicate that any of those reasons were pretextual.  In such a situation, a

15  comparative juror analysis is an additional tool that may be useful in evaluating the plausibility

16  of a prosecutor's stated reasons in light of all the evidence.  *Miller-El v. Dretke*, 545 U.S. 231

17  (2005); *see also Kesser v. Cambra*, 465 F.3d 351, 361 (9th Cir. 2006) ("in *Miller-El*, the

18  [Supreme] Court made clear that the comparative analysis is required even when it was not

19  requested or attempted in state court").

20         Here, a comparative juror analysis is beneficial to examining some, but not all of

21  the prosecutor's given reasons.  For example, the fact that Mr. J. misspelled what appeared to be

22  an abbreviation for psychology, his field of study in college, is a circumstance that was isolated

23  and unique to him.  Likewise, there is no indication that any other juror reported working with

24  the homeless or mentally ill.

25         On the other hand, the record indicates that two other jurors had backgrounds in

26  psychology.  Prospective Juror M. indicated that she had obtained a bachelor's degree in

1   psychology, while Juror S. had studied art/psychology but had not obtained a degree.

2   (Augmented RT at 322, 354.)  The prosecutor exercised peremptory challenges as to both Juror

3   M. and Juror S.  (Augmented RT at 357-58.)

4           Another potential juror reported prior service in the military.  This potential juror,

5   identified in the relevant portion of the record as Juror Number Eight, indicated that he had

6   retired from the Air Force; it was also discussed that he had previously served on two juries in

7   superior court.  (Augmented RT at 316.)  Unlike Mr. J., however, there was nothing vague or

8   confusing about Juror Number Eight's responses regarding these past experiences.  Accordingly,

9   similar concerns to those the prosecutor had regarding Mr. J. did not arise from Juror Number

10  Eight's responses about the military and the criminal justice system.

11          Petitioner has failed to carry his burden of proving the existence of unlawful

12  discrimination with respect to the prosecutor's  challenge to Mr. J.  Put simply, Mr. J.'s

13  responses during voir dire were difficult to follow.  In addition, he had completed some years of

14  college, and reported a background and current interest in psychology, yet misspelled what

15  appeared to be an incorrect abbreviation of that word.  Mr. J. also volunteered his time helping

16  less fortunate members of the community, and did not appear to have a positive memory of his

17  prior experience in the military criminal justice system.  The prosecutor expressed reasonable

18  bases for her use of a peremptory challenge against Mr. J., and those reasons are not undermined

19  by anything in the record.  The California courts' rejection of petitioner's claim is not contrary to,

20  or an unreasonable application of the *Batson* standard, nor based on an unreasonable

21  determination of the facts in light of the evidence.  Petitioner's claim regarding the prosecutor's

22  use of peremptory challenges should be denied.

23          C.      Prosecutorial Misconduct

24          For his third and final ground, petitioner claims that the prosecutor committed

25  prejudicial misconduct.  Based on the arguments petitioner presented to the California Supreme

26  Court, it appears he is claiming, specifically, that the prosecutor (1) implied that an absent

28

1   witness would have identified petitioner as one of the perpetrators; (2) improperly vouched for

2   witnesses; and (3) interjected racial stereotypes into closing argument.

3          The law applicable to each of petitioner's allegations of prosecutorial misconduct

4   is the same: the narrow standard of due process applies on habeas corpus review. *Darden v.*

5   *Wainwright*, 477, U.S. 168, 181 (1986).  A prosecutor's error or misconduct does not, per se,

6   violate a petitioner's constitutional rights.  *See Jeffries v. Blodgett,* 5 F.3d 1180, 1191 (citing

7   *Darden*, 477 U.S. at 181 and *Campbell v. Kincheloe*, 829 F.2d 1453, 1457 (9th Cir. 1987)).  A

8   criminal defendant's due process rights are violated only if the error or misconduct renders the

9   trial fundamentally unfair.  *Darden*, 477 U.S. at 181.

10          The question to be resolved is "whether the prosecutor's remarks 'so infected the

11   trial with unfairness as to make the resulting conviction a denial of due process.'"  *Hall v.*

12   *Whitley*, 935 F.2d 164, 165 (9th Cir. 1991) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

13   643 (1974.  In order to determine whether prosecutorial misconduct occurred, it is necessary to

14   examine the entire proceedings and place the prosecutor's remarks in context.  *See Greer v.*

15   *Miller*, 483 U.S. 756, 765-66 (1987).  Relief is limited to cases in which the petitioner can

16   establish that the misconduct resulted in actual prejudice.  *Johnson v. Sublett*, 63 F.3d 926, 930

17   (1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38).  Put another way, prosecutorial

18   misconduct violates due process when it has a substantial and injurious effect or influence in

19   determining the jury's verdict.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

20                    1.      Reference to the absent witness

21                        a.  Background

22          Prior to trial, it became apparent that two of the robbery victims, Alex Alekseyev

23   and Geouard Dauterive, would not appear to testify, despite having been validly subpoenaed.

24   (RT at 161-68.)  Petitioner's requests that the court take judicial notice of this fact were denied.

25   (RT at 173; 249.)

26   /////

1          Detective Chris Wilder testified at trial.  Detective Wilder said that he created a

2   photographic line-up which included petitioner's photograph.  (RT at 827.)  During his direct

3   examination the following exchange occurred:

Q:     On that same date, June 23rd of last year, did you meet with
4          Geouard Dauterive?

5   A:     Yes, I did.

6   Q:     Where did you meet with him?

7   A:     In the lobby of the Madison Inn.

8   Q:     And what was the purpose of your meeting with Geouard at
9          that time at that location?

10         [CO-DEFENDANT D. JOHNSON'S COUNSEL]: Your
           Honor, I'm going to object.
11

12         THE COURT: Sustained.

    Q:     [BY PROSECUTOR]: When you met with him, was he
13         alone?

14  A:     Yes, he was.

15  Q:     Did you show him the photographic lineup containing --

16         [CO-DEFENDANT D. JOHNSON'S COUNSEL]:
           Objection, Your Honor.  This is calling for hearsay.
17
           [PROSECUTOR]: No, it doesn't.  I'm not asking his
18          responses.  I'm asking did he do something.

19  (RT at 828.)

20          Outside the presence of the jury, co-defendant D. Johnson's attorney argued that

21  the issue of Dauterive's unavailability for trial had been discussed at length, and that in light of

22  the court's earlier rulings, the prosecutor's attempt to get into evidence the alleged fact that he

23  had identified petitioner in the lineup reflected prosecutorial misconduct.  (RT at 829-31.)  This

24  was especially damaging, she explained, given that the trial court had ruled that defendants could

25  not explain to the jury that the witness was uncooperative and had failed to appear at trial.

26  Petitioner's counsel asserted additionally  that the testimony was hearsay, and requested a

mistrial.  (RT at 830.)

The prosecutor explained her position, stating that she was merely trying to show Dauterive had been cooperative two days after the robbery and that she had not been planning to ask about "anything that came out of Dauterive's mouth," including whether he made an identification.  The discussion continued:

> THE COURT:  You can't go there.  And what you did was try and create an inference in the minds of the jurors that he showed him a lineup, and if there was anything bad, if he couldn't ID, then the defense would bring it up.
>
> So you know, what's the relevance?  What's the import of showing him a photo lineup?  So what?  If you can't show what happened, what's the relevance of it?
>
> [PROSECUTOR]: That two days after the robbery he's cooperative.
>
> THE COURT: [Co-defendant D. Johnson's counsel] is absolutely correct.  She's been trying to show that he's uncooperative. You've been objecting, and I sustained your objection.  In my mind, you've gone where you shouldn't go in having this officer testify that, "I showed him a lineup," under the argument, "Well, this is just to show that he's cooperative."...

(RT at 834.)

Ultimately the court ruled:

> All right.  Here's my impression on this.  This does not rise to the level of a mistrial.  A mistrial- in most situations, granting a mistrial should be seen as a remedy of last resort.  If possible, the improper conduct should be cured by admonishing the jury.
>
> It is very helpful for the judge to inquire early in the trial process as to any problem areas in order to avoid [or] anticipate a situation like this.  This is why I spent so much time with you folks in chambers in limine before we got rolling.
>
> There are certain grounds for mandatory mistrial under the Evidence Code.  This is not one of those.
>
> So the question is: What to do about it.  I don't have any problem with admonishing the jury to disregard the last statement- question and answer by the prosecutor about, "Did you show him a photo lineup?"  They are to disregard that...

1      ...My opinion is, based upon the totality of the evidence in this
       case, what's gone on before regarding photo lineups and in-person
2      identification, et cetera, et cetera, that the confusion on the various
       witnesses' parts, I do not think that this is the type of prejudice
3      which rises to the level of a mistrial.  I think an admonition can
       cure it.
4
       The only question I'm considering now is whether or not to re-visit
5      the issue of allowing them -- or however it was originally
       proposed, to take judicial notice of the fact that Mr. Dauterive has
6      had a bench warrant out for his arrest and has failed-- because he
       has failed to appear... [¶] All right.  I'm going to go ahead and
7      make that ruling, that you'll be allowed to do that...

8  (RT at 837-38; 40-41.)

9      When the jury returned, the court admonished:

10     ...Ladies and gentlemen, right at the break there was an objection
       lodged with respect to the last part of the prosecutor's line of
11     questioning with this officer, and I'm sustaining the objection.  It's
       with respect to questions and answers that had to do with this
12     officer allegedly showing a photographic lineup.

13     I'm ordering that not only is the objection sustained, but those
       questions and answers are stricken from the record, and I'm
14     admonishing each and every one of you to disregard those
       questions and those answers.
15
       Now, this is something that was mentioned when we were in jury
16     selection -- or actually, called the pretrial admonition, that if the
       Court rejects certain evidence, you're not to speculate as to why
17     it's rejected or what the reason for the objection was.

18     But what it further means, you're to disregard it completely, not to
       take it into account, and don't talk about it at any time during the
19     deliberations.

20     Do all of you understand that?  All right.  Thank you.

21  (RT at 844-45.)

22     Then, at the conclusion of the People's case, the court stated to the jury:

23     [Co-defendant D. Johnson's counsel] has properly asked the Court
       to take judicial notice of the Court's own file.  And that is proper in
24     certain cases under the Evidence code for the judge to look in their
       own file and say, yeah, that's true, and then tell the jury what it is.
25     Okay.

26  /////

32

1
2
3
4
5
6

> So in this case, what she is asking that the Court take judicial notice of is that on a prior date wherein this case was originally scheduled to start, which was January 13th of this year, the person Geouard Dauterive, and that's spelled D-A-U-T-E-R-I-V-E, had been personally served with a subpoena to appear in court on that date, and failed to appear in court pursuant to that subpoena. And as a result, the court issued a bench warrant for Geouard Dauterive's arrest, and as of today, that warrant is still outstanding. And that is reflected in the court's file, and the Court will take judicial notice of that.

7   (RT at 878-79.)

8            On direct appeal, the state appellate court rejected the claim, reasoning:

9            Defendants assert the prosecutor's questions effectively conveyed that Dauterive identified Herman Johnson.

10
11           " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.... In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (People v. Brown (2003) 31 Cal.4th 518, 553-554.)
12
13
14

15           No evidence about any identification Dauterive may have made was admitted, due to defense counsel's prompt objections. Further, we presume that jurors follow instructions and admonitions except in very limited circumstances. (See, e.g., People v. Abbaszadeh (2003) 106 Cal.App.4th 642, 648.) For example, a question including inflammatory and irrelevant content about a defendant (e.g., references to child molestation or terrorist activities) might cause prejudice even if the question is not answered. But in this case the questions merely asked the officer what he had done, not what Dauterive had said or done, and did not imply any inflammatory facts about Herman Johnson. The trial court promptly and thoroughly admonished the jury. We see no reason why the jury would have any inherent difficulty following the admonition, and therefore uphold the trial court's ruling denying the mistrial motion.
16
17
18
19
20
21
22

23   (C050093 opinion at 14-15.)

24   /////

25   /////

26

33

1                                    b.  Discussion

2            Mr. Dauterive was alleged to be the victim in counts III and VI, but did not appear

3   for trial.  On direct examination the prosecutor asked Detective Wilder if he met with Mr.

4   Dauterive, and if he showed him a photographic lineup.  A defense objection was made before

5   the latter question was answered.

6            As the state appellate court noted, no evidence about any identification Dauterive

7   may have made was actually admitted.  In addition, the complained of line of questioning by the

8   prosecutor, though improper, was brief in time and limited in scope.   The improper questions do

9   not appear to have been part of a larger pattern of improper conduct.  In the context of the whole

10  trial, the improper questions did not so infect the trial with unfairness that petitioner's resulting

11  conviction constituted a denial of due process.

12           The trial court's concern was the possible inference that if Dauterive was shown a

13  lineup, then any problem or issue with the line-up would be explored by the defense at trial,

14  which was impossible because Mr. Dauterive was not available.  The court sustained the

15  objection and properly admonished the jury to disregard the entire line of questioning.  It is

16  presumed that the jury followed the court's limiting instruction.  *See Greer v. Miller*, 483 U.S.

17  756, 766 n.8 (1987).  This is not a case where the risk that the jury would not, or could not,

18  follow instructions was so great "that the practical and human limitations of the jury system

19  cannot be ignored."  *See Bruton v. United States*, 391 U.S. 123, 135 (1968).  In addition to giving

20  a curative instruction, the trial court modified its earlier evidentiary ruling and allowed the jury to

21  be informed that Mr. Dauterive had been served with a subpoena to appear in court, failed to

22  appear, and that a bench warrant had been issued.  Under these circumstances, there was no

23  substantial and injurious effect on the verdict.  The California Court of Appeal's rejection of

24  petitioner's claim regarding the reference to an absent witness was not contrary to or an

25  unreasonable application of clearly established federal law.

26  /////

2.      Vouching for witnesses

a.  Background

In the rebuttal portion of the prosecutor's closing argument, she stated:

And one would ask, would the victims of this case, Lev Maslov
and Mike Linsky, put themselves through nearly six hours of
testifying here, probably about half as much at the preliminary
hearing last September, and then, you know, hanging out and
giving a statement to the police on the night of the robbery if there
was no gun?  That's a significant investment and follow-through
on this crime that these victims have put forth in this case.

Why did they come here and subject themselves to six hours of
questioning by three different lawyers?  Do you think they did that
for the heck of it?  Do you think the people in the construction
industry are paid when they are not at work?  Usually they're not.
So there's a lot at stake coming here, and they took the prospect of
testifying seriously.

Why did they come here and endure the hours of testifying that
they did?  It's because there was a gun on that night, on that
morning, in that hallway.

And think about it.  Mike Linsky got his keys back, and Lev
Maslov got some of the property that was in his wallet back.  And
so wouldn't you think, well, you know, hey, there was no gun, and
we got our stuff back, so it's not -- why are we going to bother
with this prosecution?  Keep it under the rug.

And I'll tell you, ladies and gentlemen, that's not the case here at
all.  If they were -- if this was a robbery with no gun and they got
their property back, what would be their motive?  And that's what
the defense is saying, is that they're here, they're saying that this
robbery happened with a gun.  And they repeated over and over
there is no evidence of a gun.

(RT at 994.)  Later the prosecutor continued:

Now, some comments were made about the victims being coached
or being told what to say.  And I would like to say that if that were
the case, then if -- you know, because there's nothing wrong with
the DA meeting with the witnesses prior to putting on the case.    I
mean, you would want to be prepared before you hit the stand if
you had never testified before, so there's nothing wrong with
that....

[¶] ...And you can tell right now that the witnesses were not
coached, because if they had been coached, wouldn't Lev Maslov
have said everything under oath that Mike Linsky said?  There

35

1               would be no discrepancies, no inconsistencies.

2                     And if Mike Linsky had been coached, wouldn't he have pointed
out the right person as the chubby one with the braids?  No.  That's

3 how you know that these witnesses weren't coached, because there
are fine lines.  There are discrepancies.  There are inconsistencies.

4 And that does not make a witness incredible.

5 (RT at 1004.)

6                     On direct appeal, the state appellate court rejected petitioner's claim that the

7 prosecutor improperly vouched for witnesses:

8               Defendants contend the prosecutor improperly vouched for the
victim-witnesses. This claim is based on statements made during

9 the prosecutor's rebuttal argument, *to which no objections were
interposed.* The failure to object forfeits the contention of error.

10 (*People v. Ward* (2005) 36 Cal.4th 186, 215 (*Ward* ).) In any event
it lacks merit.

11

12               " ' "[A] prosecutor is given wide latitude during argument. The
argument may be vigorous as long as it amounts to fair comment

13 on the evidence, which can include reasonable inferences, or
deductions to be drawn therefrom. [Citations.] It is also clear that

14 counsel during summation may state matters not in evidence, but
which are common knowledge or are illustrations drawn from

15 common experience, history or literature." [Citation.] "A
prosecutor may 'vigorously argue his case and is not limited to

16 "Chesterfieldian politeness" ' [citation]...." ' [Citation.]
Nevertheless, '[a] prosecutor is prohibited from vouching for the

17 credibility of witnesses or otherwise bolstering the veracity of their
testimony by referring to evidence outside the record. [Citation.]

18 Nor is a prosecutor permitted to place the prestige of [her] office
behind a witness by offering the impression that [she] has taken

19 steps to assure a witness's truthfulness at trial. [Citation.] However,
so long as a prosecutor's assurances regarding the apparent honesty

20 or reliability of prosecution witnesses are based on the "facts of
[the] record and the inferences reasonably drawn therefrom, rather

21 than any purported personal knowledge or belief," [her] comments
cannot be characterized as improper vouching.' " ( *Ward, supra,* 36

22 Cal.4th at p. 215.)

23               In this case the prosecutor did not express her personal belief in the
truth of the victim-witnesses. She asked rhetorically why they

24 would put themselves through the trouble of coming to court "if
there was no gun;" she also referred to their construction jobs,

25 which would not pay them for coming to court, arguing "there's a
lot at stake coming here, and they took the prospect of testifying

26 seriously." She later argued they were not coached, because if they

had been "[t]here would be no discrepancies, no inconsistencies."

Read in context, the prosecutor tethered the claims that the victims were truthful to facts in the record. The record citations supplied do not support the defense claim that the prosecutor improperly vouched for their honesty.

(C050093 opinion at 15-16.)

### b. Discussion

Respondent asserts that this ground is procedurally barred since no contemporaneous objection was made at trial to this portion of prosecutor's argument, and the state appellate court found that a procedural rule barred the claim.

As a general rule, a federal habeas court "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Calderon v. United States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). Even if the state rule is independent and adequate, a claim may be still reviewed by the federal court if a petitioner demonstrates: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Since procedural default is an affirmative defense, respondent bears the burden of pleading and proving that the state procedural bar is adequate and independent while petitioner bears the interim burden of placing the adequacy of the defense at issue. *See Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003). Here, respondent has met the initial burden by pleading that this claim is procedurally defaulted for petitioner's failure to object at trial. Indeed, California's contemporaneous objection rule has previously been found by the Ninth Circuit to be independent and adequate. *See Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002); *see also Rich v. Calderon*, 187 F.3d 1064, 1069-70 (9th Cir. 1999).

Thus, the burden has shifted to petitioner to place the adequacy of the

1    contemporaneous objection rule into question as "the scope of the state's burden of proof

2    thereafter will be measured by the specific claims of inadequacy put forth by the petitioner."

3    *Bennett*, 322 F.3d at 584-85.  Petitioner did not file a traverse, and made no specific allegations

4    as to the adequacy of the state procedure.  Petitioner has failed to satisfy his interim burden under

5    *Bennett* and it must be concluded that the state procedural bar applied to petitioner's case rests on

6    an adequate and independent state procedural ground.  *See generally  King v. Lamarque*, 464

7    F.3d 963, 967 (9th Cir. 2006) ("*Bennett* requires the petitioner to 'place [the procedural default]

8    defense in issue" to shift the burden back to the government").  Although petitioner is pro se, and

9    has recently requested the appointment of counsel, the interests of justice do not require that

10   counsel be appointed in order for petitioner to challenge the adequacy of the asserted procedural

11   bar because this ground and the one that follows, which respondent likewise asserts is

12   procedurally barred, are both without merit.

13          Petitioner's allegations of improper vouching are not supported in the record.

14   "Vouching consists of placing the prestige of the government behind a witness through personal

15   assurances of the witness's veracity, or suggesting that information not presented to the jury

16   supports the witness's testimony."  *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.

17   1993); *see also United States v. Simtob*, 901 F.2d 799, 805 (9th Cir. 1990).

18          Improper vouching has been found, for example, where the prosecutor "plainly

19   implied that she knew [a Federal agent] would be fired for committing perjury and that she

20   believed no reasonable agent in his shoes would take such a risk."  *United States v.*

21   *Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005).  The *Weatherspoon* court held that

22   prosecutor's urging that legal and professional repercussions served to ensure the credibility of

23   the officers' testimony sufficed for the statement to be considered improper vouching based upon

24   matters outside the record.  *Id.*; *see also United States v. Pungitore*, 910 F.2d 1084, 1124 (3rd

25   Cir. 1990) (prosecutor's statement that federal agents would not have coached witnesses because

26   they would have "jeopardized our jobs, our careers, our right to practice law, they're [sic] right to

38

1  continue as FBI agents..." found improper).

2          Here, in contrast, the prosecutor did not express her own belief in the credibility

3  of any witness, or imply that any information not in evidence supported their accounts or assured

4  their credibility.  Rather, the prosecutor summarized facts in the record and used them to offer

5  reasonable inferences therefrom which supported her case, including that the victims had no

6  motivation to lie, that they would not have bothered to testify if there was no gun involved as the

7  defense claimed, and that discrepancies in their testimony demonstrated that they were not

8  coached.  In this regard, the jury was obviously aware that both men had taken the time to appear

9  to testify at trial.  There was evidence in the record that on the night of the robbery a wallet and

10  watch were returned to the victims (RT at 733), and that Mr. Maslov recovered his wallet and

11  Mr. Linsky's keys after someone contacted his father and demanded $100 for return of the

12  property (RT at 471, 483-84).

13          There was also evidence that both men worked in construction.  (RT at 257; 422-

14  23.)  While no evidence was admitted at trial regarding whether construction workers are

15  typically paid when they are not at work, the prosecutor's statement that people working in the

16  construction industry are "[u]sually" not paid when they are not at work is not comparable to the

17  prosecutors' improper statements in *Weatherspoon* or *Pungatore* that no federal agent or

18  prosecutor would ever risk being fired by committing perjury or coaching a witness.  The latter

19  implied that government testimony was inherently credible because of the possibility of legal or

20  professional repercussions, while the former simply drew an inference based on the common

21  sense notion that construction workers are typically paid for their labor as opposed to being

22  salaried employees.

23          All of the prosecutor's references were based on evidence that was in the record or

24  upon inferences that could be reasonably drawn therefrom.  Moreover, nothing the prosecutor

25  said gave the impression that she was personally aware of the witness' truthfulness.  The

26  complained of statements did not constitute improper vouching.

1    Additionally, petitioner has not shown that he suffered actual prejudice.  In light

2  of the evidence at trial against petitioner, there is no likelihood that the prosecutor's comments

3  had a substantial and injurious effect or influence in determining the jury's verdict.  In addition to

4  the testimony of Mr. Maslov and Mr. Linsky, there was testimony from police officers regarding

5  the events on the night of the robbery.  Additionally there was evidence that both Mr. Maslov and

6  Mr. Linsky identified petitioner as one of the robbers in a photographic lineup.

7    In sum, the complained of remarks during the prosecutor's closing argument

8  about the victims' testimony did not make petitioner's trial so unfair that his resulting conviction

9  constituted a denial of due process.  Rejection of this claim by the California Court of Appeal

10  was not contrary to or an unreasonable application of clearly established federal law.

11                    3.    Racial stereotypes

12                        a.  Background

13    During closing argument, petitioner's attorney pointed out that no gun was

14  introduced into evidence and argued that there was no reliable evidence of the use of a gun

15  during the robbery.  (RT at 948-52; 994-95.)  On rebuttal, the prosecutor sought to counter the

16  claim:

17          [The defense] repeated over and over there is no evidence of a gun.
            [¶] Incorrect.  There is evidence before you that a gun was in that
18          hallway.  There just isn't a gun on the evidence table.

19          And what is the evidence that you heard that there was a gun
            present?  Well, I went over that this morning.  Both Lev and Mike
20          testified to how it looked, what type they thought it was.  And by
            that I mean nine millimeter or .45.  And that both of them said it
21          was a real gun.  [¶] And while Mike Linsky admitted that he's seen
            guns on TV, he's also seen them in real life.  So whatever
22          knowledge that he has about guns doesn't just come from
            television.  He said that he had friends with guns.  He's seen them
23          before.  He knows that nine millimeters and .45s are pretty close.
            [¶]  Lev, on the other hand, said he didn't really know much about
24          guns, and he didn't look all that attentively at this one, but he saw
            enough of it to know that it was a real gun.
25          And you have to think about the context of what was happening in
            this hallway.  It was a robbery, ladies and gentlemen, an armed
26

                                          40

robbery.  And when you commit a robbery on multiple victims and in a public place like that, you are going to use a gun, because the thing is, we're not talking about a back yard barbecue, a couple twelve-year-olds, you know, toy gun or whatever.  That's the context, you know, where there are toy guns.

But when you're going to take over multiple people in a public place, and you're going to do it in less than two minutes, you're going to do it with a real gun.

Now, this is a picture of David Johnson taken when he was booked.  And in that photograph -- you know, booking photos are not flattering.  And but it goes to show you that people on the day they commit crimes don't look like they do in court.  And I submit to you that that is the face of somebody that can put a gun to Lev Maslov's head and tell everybody in the hallway to empty their pockets.

Does he look like he would have used a fake gun or no gun, or that the victim, if they say that there was a gun, that he, in fact, used it?  And you'll see those photographs.

And the victims in this case are young Russian men.  And I believe that Lev did tell us that he was scared while this was happening.  And the fact that Deputy Miller didn't say that they looked scared doesn't mean that they were not scared.  It's just not an emotion that Deputy Miller remembers seeing.  He felt that it was more of an angry, shock kind of thing.  And that's the same thing that Les Maslov said, "I was shocked.  I stood there.  I didn't even go into my own pockets.  I had never been told to do that before.  And this guy goes into my pockets for me, and I've got a gun, you know, on my chin or on the side of my face or my jaw bone or on the back of my head."

(RT at 996-97.)

Subsequently, also during rebuttal, the prosecutor stated:
Much was made about the scenario in which Mike Linsky got his keys back and Les Maslov got some of the property back from his wallet.  Counsel found that bizarre.[1]  It's just another tale or some of the fallout related to this robbery.

And I'd have to say that that's probably just the way the

---

[1] This was apparently in response to co-defendant D. Johnson's attorney's argument that the evidence about Mr. Maslov's dad recovering some of his property after receiving a phone call and paying one-hundred dollars "makes this case entirely bizarre."  (RT at 967.)

neighborhoods in North Highlands work.  It's an area of Sacramento County where it's a shame that somebody who found somebody's lost property on their lawn is going to turn around and charge somebody to get it back.

But you'll recall that at the time that Lev Maslov's father got the call, Lev hadn't told him that he had been robbed.  So you can just picture the father going, "Oh, you found by son's stuff on the lawn?"

"Yeah."

"I'll pay you to get it back because I want my son to have his stuff back."

After that, Lev was like, "hey, I got robbed, and that's why this stuff is on the person's front yard, or whatever.  As bizarre as that may be to counsel, it is the fallout of a robbery.  You can picture that these defendants wouldn't have any use for, you know, somebody's Safeway Club Card or, you know, any other of the miscellaneous papers or receipts that Lev Maslov had in his wallet.

They would take cash if there was any.  And it doesn't sound like there was.  And they didn't want the picture of the girlfriend -- or they did want the picture of the girlfriend.  I don't know.  That's the only thing that was in the wallet.  That just ended up on somebody's lawn.  And you can't fault the victims for trying to get their property back.

As you'll recall, Lev Maslov never got the keys to his Jetta back, despite his father going to this location and getting the property back.

(RT at 1001-02.)

On direct appeal, this claim was rejected:

Defendants contend the prosecutor injected racial stereotypes into the trial. Defendants concede they interposed no objection to this alleged conduct. "Accordingly, [they have] not preserved [their] claims." ( *People v. Ochoa* (1998) 19 Cal.4th 353, 427-428.) In any event, the claims fail.

The first claim is that at one point in *rebuttal* argument the prosecutor held up a booking photograph of David Johnson and made a comment that was a veiled racial inference. Otherwise improper arguments may be fair if made in response to a defense argument. ( *People v. Cunningham* (2001) 25 Cal.4th 926, 1026; *People v. Hill* (1967) 66 Cal.2d 536, 560-562 ["a prosecutor is

justified in making comments in rebuttal, perhaps otherwise improper, which are fairly responsive to argument of defense counsel and are based on the record"].) However, tactics "appealing to or likely to incite racial prejudice" are improper. (*People v. Cudjo* (1993) 6 Cal.4th 585, 625-626.)

In the prosecutor's *opening* argument, she had held up or referred to photographs in evidence of Mitchell Green, Herman Johnson and David Johnson, arguing witnesses had consistently identified David Johnson as the person with the gun, that Herman Johnson helped, and that Mitchell Green was present but was the person who did not participate in the robbery. She argued the testimony and reasonable inferences therefrom showed David Johnson used a real gun.

David Johnson's counsel argued no gun was ever found and the story told by the victims and their demeanor indicated no gun was involved, that they were angry when the police arrived, but not afraid. *David Johnson's attorney held up his booking photo,* arguing it did not match the description given by the victims.

In partial response, the prosecutor commented that "people on the day they commit crimes don't look like they look in court. And I submit to you that that is the face of somebody that can put a gun to Lev Maslov's head and tell everybody in the hallway to empty their pockets. [¶] Does he look like he would have used a fake gun or no gun, or that the victims, if they say that there was a gun, that he, in fact, used it? And you'll see those photographs. [¶] And the victims in this case are young Russian men. And I believe that Lev did tell us that he was scared while this was happening." She then argued that nobody could predict what a person's reactions would be after being held up at gunpoint.

Defendants contend the quoted passage, particularly the juxtaposition of "young Russian men" against the photograph of a Black defendant, was an effort to appeal to racial stereotypes on the part of the all-White jury. We disagree. The reference was to the *youth* and immigrant status of the victims, and the prosecutor was attempting to rebut the defense claim that the victims had not been scared when the police arrived. Defense counsel had herself referred to the same photograph, in an effort to show the image depicted did not match descriptions given to the police. It was quite proper for the prosecutor to refer to the same photograph and invite the jury to draw a different inference therefrom.

The second claim is that the prosecutor referred to a neighborhood in such a way as to portray it as a crime-ridden Black ghetto. The record does not support the claim.

Victim Linsky testified that his car keys had been taken but he got them back about a week later through Maslov. Maslov testified that

a day or so after the robbery someone left a message with his father stating they had found some identification papers and receipts in front of their house and wanted $100 for them; Maslov's father retrieved the papers and Linsky's car keys.

The defense argued this was "entirely bizarre" and "just crazy," and suggested Maslov made up the robbery tale. In response, the prosecutor argued, "that's probably just the way neighborhoods in North Highlands work. It's an area of Sacramento County where it's a shame that somebody who found somebody's lost property on their lawn is going to turn around and charge somebody to get it back."

The lack of objection not only precludes our review of the claimed error, it suggests that trial counsel did not interpret the comment, in context, as a racist comment. In our view the remark was at worst a reference to *poverty,* not race. Nothing in the record shows this was designed to appeal to any racist stereotypes on the part of jurors. The remark was tied to the evidence and fairly responded to a specific defense argument about that evidence. We find no error.

(C050093 opinion at 16-19.)

2.    Discussion

The state appellate court indicated that this claim, too, was barred because of petitioner's failure to object at trial.  Again, respondent sufficiently pleads that this ground is procedurally defaulted.  Based on petitioner's failure to contest the affirmative defense, the state procedural bar will be found independent and adequate.

In any event, this claim also lacks merit.  "The Constitution prohibits racially biased prosecutorial arguments." *McCleskey v. Kemp*, 481 U.S. 279, 310 (9th Cir. 1987) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  But the prosecutor made no racially biased arguments in this case.

The prosecutor held up co-defendant D. Johnson's booking photo and stated "that is the face of somebody that can put a gun to Lev Maslov's head and tell everybody in the hallway to empty their pockets."  This was in response to D. Johnson's attorney's argument that his booking photo did not match the description given by the victims.  As noted by the state appellate court, it was proper for the prosecutor to refer to the same photograph as defense

44

counsel and invite the jury to draw a different inference.  It appears the prosecutor was simply trying to make the point that when people appear in court they do not appear the same as they did when they committed the crime.  There were no racial inferences to be drawn.

Shortly afterwards, the prosecutor commented that the victims in this case were young Russian men.  Again, this comment does not appear to have been racially motivated, but rather, was a reference was to the youth and immigrant status of the victims, in rebuttal to the defense arguments that the victims' demeanor and actions after the robbery were not consistent with those typically observed by police after a crime such as robbery at gunpoint has taken place.

Nor does it appear that the prosecutor's reference to the North Highlands neighborhood was intended to appeal to any racial biases on the part of the jury.  The defense had attacked the credibility of the victims, stating that the circumstances under which some of their property was recovered were "bizarre," implying that there was more to the story than was told by the victims.  The prosecutor responded "that's probably just the way neighborhoods in North Highlands work.  It's an area of Sacramento County where it's a shame that somebody who found somebody's lost property on their lawn is going to turn around and charge somebody to get it back."  The state appellate court reasonably found that this was not a racial remark, but rather, was fairly tied to the evidence in response to a specific defense argument about that evidence.  Moreover, it is not likely that these comments influenced the jury; they certainly did not have a substantial and injurious effect or influence in determining the verdict, given the evidence in the case as previously described. The California Court of Appeal's conclusion that petitioner was not entitled to relief for his claims of prosecutorial misconduct is not contrary to, or an unreasonable application of clearly established applicable federal law.

## VI.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District

45

1  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days

2  after being served with these findings and recommendations, any party may file written

3  objections with the court and serve a copy on all parties.  Such a document should be captioned

4  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

5  shall be served and filed within ten days after service of the objections.  The parties are advised

6  that failure to file objections within the specified time may waive the right to appeal the District

7  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8  DATED: April 13, 2010

9  _____

   CHARLENE H. SORRENTINO
10  UNITED STATES MAGISTRATE JUDGE